**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
    CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 3, 2022

Elizabeth Wilburn Joyce, Esquire
Megan Ix Brison, Esquire
Pinckney, Weidinger, Urban & Joyce LLC
2 Mill Road, Suite 204
Wilmington, DE 19806

"J" Jackson Shrum, Esquire
Jack Shrum, P.A.
919 N. Market Street, Suite 1410
Wilmington, DE 19801

Re:    *Paul Elton, LLC v. Rommel Delaware, LLC et al.*,
       C.A. No. 2019-0750-KSJM

Dear Counsel:

On December 30, 2021, I issued an order finding the defendants liable on summary judgment for breach of the plaintiff's Proceeds Right arising out of several agreements between the parties (the "Order").[1]  As relief, I ordered Defendants to specifically perform their obligation to participate in the Appraisal Process.[2]  The parties agreed by stipulation to select their respective appraisers on or before January 31, 2022, and provide copies of their appraisals on or before April 1, 2022, which they did.[3]

The Appraisal Process did not proceed as smoothly as I had hoped.[4]  To recap, the Purchase Agreement provides that if the parties cannot agree on the value of the Additional Space after a sale, they shall each "select an appraiser to complete an appraisal of the value

---

[1] C.A. No. 2019-0750-KSJM, Docket ("Dkt.") 77 ("Order") ¶¶ 12–13, 15–16, 32.  Defined terms used in this letter have the meaning ascribed to them in the Order.

[2] *Id.* ¶ 32.

[3] Dkt. 83 ¶¶ 1–2; Dkt. 84; Dkt. 85; Dkt. 87; Dkt. 88.

[4] *See* Order ¶¶ 26–31.

of the [sale of] the Additional Space."[5] If the two appraisals are less than 5% divergent in value, "then the average of the two appraisals shall be the price."[6] If the two appraisals are more than 5% divergent, however, "then the two appraisers shall . . . select a third appraiser and the average of the two closest appraisals shall be" the value of the sale of the Additional Space.[7]

Plaintiff's appraiser valued the Additional Space at $5.6 million.[8] Defendants' appraiser valued the Additional Space at $1.74 million.[9] These valuations are more than 5% divergent which, as provided in the Appraisal Process, ordinarily would mean that the parties' two appraisers should jointly selected a third appraiser to perform its own valuation.

Unexpectedly, however, the parties' appraisers used different definitions of the term "Additional Space," explaining at least part of the wide discrepancy between their valuations. The parties' appraisers agree, at least, that the Property comprises approximately 5.75 acres and the retrospective date of value is April 17, 2018, the date the Sale closed.[10]

---

[5] Dkt. 91 ("Defs.' Mot.") Ex. A. ("Purchase Agreement") § 4.

[6] *Id.*

[7] *Id.*

[8] Dkt. 92 ("Pl.'s Mot.") Ex. B ("Pl.'s Appraisal"), Transmittal Letter at 2.

[9] Pl.'s Mot. Ex. A ("Defs.' Appraisal"), Transmittal Letter at 11.

[10] *Compare* Pl.'s Appraisal, Transmittal Letter at 1–2, *with* Defs.' Appraisal, Transmittal Letter at 1.

Plaintiff's appraiser reviewed "[t]he land development application for the proposed Royal Farms site [that] was submitted to the New Castle County Planning Department in August 2017 and the final plan [that] was recorded on June 28, 2018, subsequent to the retrospective date of value."[11] Based on these "site plans," Plaintiff's appraiser found that 3.25 acres of the Property supported "the existing improvements," including the former Harley-Davidson dealership, while the remaining 2.5 acres supported "the proposed Royal Farms improvements."[12] Plaintiff's appraiser identified the 2.5 acres as the Additional Space subject to appraisal.

Defendants' appraiser, meanwhile, relied on an August 9, 2010 plat of the property entitled "Paul Elton LLC, 2160 New Castle Avenue" showing "the majority of the property in support of the existing dealership building and its site improvements, with a" 1.25-acre "potential pad site" at the northeast corner.[13] Defendants' appraiser considered it "abundantly clear from the lease agreement language that the primary use of the property was the dealership and that no 'additional use' should degrade or minimize the value of that primary business operation."[14] Because the 2.5-acre pad site for the Royal Farms location was double the size of the site in the 2010 plat, and because building the 2.5-acre

---

[11] Pl.'s Appraisal, Transmittal Letter at 1.

[12] *Id.*

[13] Defs.' Appraisal, Transmittal Letter at 3, 5.

[14] *Id.* at 4.

site "required demolition of the dealership improvements," Defendants' appraiser valued the 1.25-acre pad site as the Additional Space.[15]

Once the parties realized that the valuations were more than 5% divergent, they began negotiating a stipulation governing the process for engaging the third appraiser.[16] The negotiations failed, however, and on April 21, 2022, I granted the parties' stipulated order governing the schedule on the parties' planned, competing motions for entry of a second order governing the appraisal process.[17]

Defendants moved first, filing a motion on May 2, 2022, against entry of a second order governing the Appraisal Process or, alternatively, for entry of a second order governing the Appraisal Process "as agreed by the parties," based on one of the drafts proposed in negotiations.[18] Plaintiff filed its motion on May 4, seeking entry of an order governing the Appraisal Process or, alternatively, instructions from the court regarding the scope of the third appraisal.[19] The parties filed their oppositions to these competing motions on May 13,[20] and I heard oral argument at a hearing on July 18.[21]

---

[15] *Id.* at 5.

[16] Pl.'s Mot. ¶ 13; Pl.'s Mot. Exs. C–D.

[17] Dkt. 90.

[18] Defs.' Mot. at 1.

[19] *See generally* Pl.'s Mot.

[20] Dkt. 94 ("Defs.' Opp'n"); Dkt. 95 ("Pl.'s Opp'n").

[21] Dkt. 100 ("Oral Arg. Tr.").

Although the parties' positions on requested relief have shifted somewhat since the motions were originally filed, they are now clearer.[22] The parties agree[23] that the Purchase Agreement defines "Additional Space" as "additional space on the Property which is not required for the operations of the primary tenant of the Property."[24] In Defendants' view, this definition, in addition to the Purchase Agreement's directive that appraisers "complete an appraisal of the value of the [sale of] the Additional Space," offers the third appraiser all of the authority and guidance necessary to complete the third appraisal, obviating the need for court intervention.[25]

Plaintiff responds noting that I "found that there was no genuine issue of material fact, including as to the Additional Space" when I granted its motion for partial summary judgment in December.[26] Plaintiff argues that the third appraiser should be instructed to value the 2.5-acre area on which Royal Farms operates as the Additional Space based on (i) the definition in the Purchase Agreement; (ii) the fact that its original appraisal, the only one on the record when I issued the Order and to which Defendants did not object, used

---

[22] Defs.' Opp'n at 1–2 ("Since it is now clear that there is no agreement between the parties as to the terms of the second proposed stipulation governing the appraisal process, this Court should enter no order as to the process for selecting the third appraiser and allow the parties to engage in the process set forth in Purchase Agreement, which is precisely the remedy the Court ordered.").

[23] Pl.'s Opp'n ¶ 4; Defs.' Opp'n at 4.

[24] Purchase Agreement § 4.

[25] Defs.' Opp'n at 4.

[26] Pl.'s Opp'n ¶ 17.

the 2.5-acre area; (iii) the Order's acknowledgement that the purchaser of the Property "planned to redevelop the Additional Space into a convenience store, gas station, and car wash;"[27] and (iv) Defendants' answer to the complaint, in which they admitted in paragraphs 33 and 35 that they leased back the Harley-Davidson dealership and continued to operate it after closing the Sale in April 2018, while the new buyer developed the Royal Farms area.[28]

I address Defendants' position first, because it strikes at the court's jurisdiction. Defendants' argument that "any interpretation of 'Additional Space' for purposes of the appraisal process falls within the authority of the appraisers, not this Court" is not supported by either the Purchase Agreement or applicable law.[29] Defendants cite a number of cases for the unremarkable proposition that the court cannot compel parties to agree to contracts or stipulations, but fail to distinguish Plaintiff's authorities effectively or marshal any other Delaware case law in support of their position.[30]

---

[27] Order ¶ 10.

[28] Oral Arg. Tr. at 10:20–11:2.

[29] Defs.' Opp'n at 8.

[30] *See* Defs.' Mot. at 7–11; Defs.' Opp'n at 3–9; *Application of Wilm. Suburban Water Corp.*, 203 A.2d 817, 832 (Del. Super. 1984) ("A stipulation is, in effect, an agreement or admission made in a judicial proceeding by the parties thereto in respect to same matter incident to the proceeding for the purpose of avoiding delay, trouble, and expense.") (citation omitted); *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983) (affirming the Family Court's conclusion that a "stipulation was an agreement made in a divorce action between the husband and wife in respect of alimony and property distribution" and therefore "a contract between the husband and wife concerning alimony"); *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020) ("First, it is axiomatic that courts cannot rewrite contracts or supply omitted provisions. Doing so does

Plaintiff cites a line of Delaware cases illustrating the distinction between the submission of legal disputes to an arbitrator and the delegation of narrow factual questions to an expert's determination,[31] including Vice Chancellor Laster's decision in *Penton Business Media Holdings, LLC v. Informa PLC*.[32] In *Penton*, the seller in a merger sought a declaration that, pursuant to the merger agreement's dispute resolution provision, the accounting expert designated by the parties could consider extrinsic evidence in deciding a tax dispute between the parties. After an extensive analysis, the court first held that Delaware law acknowledges and respects the distinction between an arbitration and an expert determination.[33] The court then held that "[d]etermining what type of dispute resolution mechanism the parties have agreed to presents a question of contract interpretation."[34] "If parties have not stated their intention explicitly, then a court will have to examine other aspects of the contract or even turn to extrinsic evidence."[35]

---

not respect the parties' freedom of contract.") (footnote omitted); *Local 435 v. Gen. Motors Corp.*, 1987 WL 6451, at *2 (Del. Super. Jan. 22, 1987) (enforcing the terms of a stipulation after "[a]pplying a contract analysis to determine intent of the parties").

[31] *See* Pl.'s Opp'n ¶¶ 8–10, 12–14, 16 (citing *Penton Bus. Hldgs., LLC v. Informa PLC*, 252 A.3d 445 (Del. Ch. 2018); *AQSR India Priv., Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910 (Del. Ch. June 16, 2009); and *AIU Ins. Co. v. Lexes*, 815 A.2d 312 (Del. 2003)).

[32] 252 A.3d 445 (Del. Ch. 2018).

[33] *See id.* at 460–61.

[34] *Id.* at 461.

[35] *Id.* at 462.

The *Penton* court was able to resolve the matter based on clear contractual language stating that the accounting firm would act as an expert and not an arbitrator, which is not present here, but cited with approval the following from a report issued by a committee of the New York City bar association, as well as other sources, indicating that the distinction is a matter of scope of authority:[36]

> We suggest that . . . the fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker. In the case of a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact. The parties agree that the expert's determination of the disputed factual issue will be final and binding on them. The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability.[37]

Here, the Purchase Agreement directs the appraisers selected pursuant to the Appraisal Process "to complete an appraisal of the value of the [sale of] the Additional Space."[38] The Purchase Agreement contains a Delaware choice of law provision, but no forum selection provision.[39] The Lease Agreement, while not implicated by the current

---

[36] *Id.* at 463–65.

[37] Comm. on Int'l Com. Disps., N.Y. City Bar Assoc., *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements*, at 4 (2013).

[38] Purchase Agreement § 4.

[39] *Id.* § 15.

dispute, is instructive to the extent that it contains an arbitration clause applicable "to any monetary disputes that arise under the Lease Agreement that are not subject to appraisal mechanisms."[40]

The "appraisal mechanisms" in the Lease Agreement are found in Section K and are nearly identical to the Appraisal Process found in Section 4 of the Purchase Agreement.[41] The distinction drawn between "appraisal mechanisms" and "arbitration" in the Lease Agreement indicates that the Appraisal Process does not grant the appraisers the broad scope of authority to resolve both legal and factual disputes between the parties common to that granted to an arbitrator, and thus, I hold that the Appraisal Process calls for an expert determination of the value of the sale of the Additional Space.

The *Penton* court, after making a similar holding, then held that the scope of an expert's jurisdiction is similarly a matter of contract interpretation:

> Parties have a range of options when choosing an adjudicator to determine the scope of the expert's jurisdiction. The contract can specify that the expert determines the scope of its own jurisdiction. The contract can specify a plenary adjudicator, such as an arbitrator, to decide issues under the contract that would include the scope of the expert's jurisdiction. The contract can also leave that function to the courts. The parties can select a particular court through a forum-selection clause, or the contract can remain silent and allow any court that can exercise subject matter jurisdiction

---

[40] Dkt. 49, Transmittal Aff. of Megan Ix Brison, Esq. in Supp. of Pl.'s Opening Br. in Supp. of Summ. J. ("Brison Aff.") Ex. 6 ("Lease Agreement") § 44.

[41] *Compare* Lease Agreement § K, *with* Purchase Agreement § 4.

over the dispute and personal jurisdiction over the parties to act
in that role.[42]

As noted, the Purchase Agreement does not contain a forum selection clause, and thus, the scope of the appraisers' jurisdiction is presumptively a matter for the court to decide. The Purchase Agreement defines the Additional Space and directs the appraisers pursuant to the Appraisal Process "to complete an appraisal of the value of the [sale of] the Additional Space."[43] Nowhere does the Purchase Agreement direct the appraisers to define the Additional Space, and thus, this too is a matter left to the court's discretion.

The Purchase Agreement's definition of Additional Space does not specify an acreage.[44] Plaintiff's appraiser based its valuation on the designation of 2.5 "disturbed" acres in the redevelopment plan submitted to the New Castle County Planning Department in 2017 on which the Royal Farms would be built.[45] Defendants' appraiser based its valuation on a 1.25-acre pad site from a 2010 plat of the Property, which was created contemporaneously with the agreements at issue in this litigation.[46]

The Appraisal Process cannot proceed as contemplated under these circumstances. As I described in the Order, the purpose of the third appraiser is to mitigate the risk that the parties to the Appraisal Process will proffer unreasonable initial valuations favoring

---

[42] *Penton*, 252 A.3d at 465.

[43] Purchase Agreement § 4.

[44] *See id.*

[45] Pl.'s Appraisal, Transmittal Letter at 1.

[46] Defs.' Appraisal, Transmittal Letter at 3–5.

their own side because the initial valuation furthest from the third, hopefully most neutral valuation, will be discounted from the analysis.[47] The Appraisal Process's utility is stunted to the point of uselessness, however, when the appraisers cannot even agree on the size and location of the property they are evaluating. To be useful, the Appraisal Process requires an apples-to-apples comparison.

In my view, the size of the Additional Space has already been revealed through this litigation. The Purchase Agreement defines the "Additional Space" as "additional space on the Property which is not required for the operations of the primary tenant of the Property."[48] When Defendants leased the Property from Plaintiff, and indeed when they bought it, Rommel Motorsports Delaware, Inc. operated a Harley-Davidson motorcycle dealership on the Property.[49] The remainder of the Property comprised a "vacant restaurant building, a vacant guest check in facility, two vacant former hotel buildings, and another auxiliary building associated with the former hotel operations."[50]

Thus, Defendants' "operations" consisted of running the Harley-Davidson dealership. At the time of the Sale giving rise to the Proceeds Right, Defendants leased back the portion of the Property on which the dealership sat and "Defendants admit that Rommel Motorsports Delaware continued to operate a motorcycle-dealership on the

---

[47] Order ¶¶ 26–31.

[48] Purchase Agreement § 4.

[49] Dkt. 1 ("Compl.") ¶¶ 6, 9, 22; Dkt. 33 ("Answer") ¶¶ 6, 9, 22.

[50] Compl. ¶ 11; *see* Answer ¶ 11.

Harley Space after Settlement in April of 2018 and operated next to the Royal Farms space."[51] The "Exploratory Resubdivision Plan" that David Rommel executed in August 2017 described a 2.5-acre plot on which he proposed the construction of a new "Royal Farms Convenience store with Gas Station."[52]

Considering that Defendants continued to operate the Harley-Davidson dealership next to the Royal Farms space after the Sale, that 2.5-acre space was "not required for the operations of the primary tenant of the Property" and thus constitutes the Additional Space. Therefore, Defendants' motion is denied, and Plaintiff's is granted only to the extent that it requests instruction on the Appraisal Process.

What to do next is a thornier question. At oral argument, Plaintiff suggested doubling Defendants' appraiser's $1.74 million valuation of the 1.25-acre plot for purposes of determining the valuation closest to the third appraiser's valuation as part of the Appraisal Process.[53] Another option is for Defendants to commission a new appraisal of the 2.5-acre plot at their expense. There may be others. Defendants shall submit a letter to the court outlining their position within five business days of this decision.

---

[51] Compl. ¶¶ 33, 35; Answer ¶¶ 33, 35.

[52] Brison Aff. Ex. 17 (Exploratory Resubdivision Plan) at PE001136, PE001138.

[53] Oral Arg. Tr. at 20:18–21.

IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. Jude McCormick*

Kathaleen St. Jude McCormick
Chancellor

cc:    All counsel of record (by *File & ServeXpress*)